**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **EDWARD MANSFIELD** and **MATTHEW MARCHIONNDA,** | ) ) ) |
| Plaintiffs, | ) ) |
| v. | )  2:22cv1159 )  **Electronic Filing** |
| **NORFOLK SOUTHERN RAILWAY COMPANY,** | ) ) ) |
| Defendant. | ) |

**OPINION**

Plaintiffs commenced this personal injury action pursuant to the Federal Employers' Liability Act (FELA) seeking redress for injuries sustained when a train they were operating struck a pile of rocks from a rockslide. Presently before the court is defendant's motion for summary judgement. For the reasons set forth below, the motion will be denied.

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(A). Rule 56 "'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)). Deciding a summary judgment motion requires the court to view the facts, draw all reasonable inferences and resolve all doubts in favor of the nonmoving party. Doe v. Cnty. of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001).

The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. When the movant does not bear the burden of proof on the claim, the movant's initial burden may be met by demonstrating the lack of record evidence to support the opponent's claim. Nat'l State Bank v. Fed. Reserve Bank of New York, 979 F.2d 1579, 1581-82 (3d Cir. 1992). Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a *genuine issue for trial*," or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Electric Industrial Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(E)) (emphasis in Matsushita). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In meeting its burden of proof, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. The non-moving party "must present affirmative evidence in order to defeat a properly supported motion" . . . "and cannot simply reassert factually unsupported allegations." Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989). Nor can the opponent "merely rely upon conclusory allegations in [its] pleadings or in memoranda and briefs." Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir. 1992); Sec. & Exch. Comm'n v. Bonastia, 614 F.2d 908, 914 (3d Cir. 1980) ("[L]egal conclusions, unsupported by documentation of specific facts, are insufficient to create issues of material fact that would preclude summary judgment."). Likewise, mere conjecture or speculation by the party resisting summary judgment will not provide a basis upon which to deny the motion. Robertson v. Allied Signal, Inc., 914 F.2d 360, 382-83 n.12 (3d Cir. 1990). If the non-moving party's evidence is merely colorable or lacks

sufficient probative force summary judgment may be granted.  <u>Anderson</u>, 477 U.S. at 249-50;
<u>see</u> <u>also</u> <u>Big Apple BMW, Inc. v. BMW of N. Am., Inc.</u>, 974 F.2d 1358, 1363 (3d Cir. 1992),
<u>cert.</u> <u>denied</u>, 507 U.S. 912 (1993) (although the court is not permitted to weigh facts or
competing inferences, it is no longer required to "turn a blind eye" to the weight of the
evidence).

The record as read in the light most favorable to plaintiffs establishes the background
set forth below.  Defendant is a railroad company engaged in interstate commerce.  On
December 12, 2021, plaintiffs were employed by defendant as a locomotive engineer and
conductor and were acting within the course and scope of their employment while operating a
westbound train on defendant's "Mon Line Track 2."  At approximately 4:00 a.m, their train
struck a pile of debris at milepost 9.3 due to a rockslide from the adjacent hillside.  At that
location the tracks abut a steep hillside that transcends upward at a significant vertically-
slanted incline.  The hillside had significant layers of stone within its composition.  There are
large sections of "cut" stone in the outer-most face of the hillside, which is referred to as "cut
rock" by railroad personnel.  This characteristic of the terrain generally extends from milepost
9 to milepost 10, with large sections of cut rock existing at various locations within that one-
mile stretch.

The specific area where the derailment occurred is known as "CP Beck."  In the
direction plaintiffs were traveling the tracks cross a highway and make a bend while doing so.
Sight ahead is partially limited while traversing through this area, and a signal system is
stationed to assist with safe passage into and through the corridor.  When plaintiffs traversed
into this area the signal was clear.  As they proceeded through and out of the bend, the light
from their locomotive suddenly illuminated a large obstruction in the center of the tracks.

Plaintiffs had only a few seconds to react once they realized the magnitude of the obstruction and they moved to the center of the engine to brace for the upcoming impact.

The rocks on the tracks caused the locomotive in which plaintiffs were working to flip over and several cars to derail. Conductor-plaintiff Edward Mansfield ("Mansfield") was diagnosed with a concussion, post-concussion syndrome and anxiety following the accident and was out of work from December 12, 2021, through December 29, 2022. Engineer-plaintiff Matthew Marchionda was diagnosed with a concussion, post-concussion syndrome and foraminal stenosis of the cervical spine following the accident and was out of work from December 12, 2021, through December, 2023. Pretrial Stipulation (Doc. No. 40) at ¶¶ III (a)-(h).

Prior to the derailment, several rockslides had occurred between mileposts 9.0 and 9.9. A rockslide occurred in the area on January 11, 2013. Engineer Leis was driving the train when it collided with debris on the tracks. She completed a report stating: "while operating 653 North on track 1 at Monline 9.2 [the locomotive] struck 2 large rocks fouling track 1." Report of Personal Injury of Cathy M. Leis (Doc. No. 43-7) at 4. She provided this description in two separate reports of personal injury that were completed within a few hours of the incident. Id. p. 6. Leis' supervisor completed a report that also identified the location of the incident as occurring at milepost 9.2. Id. at pp. 4-5.

Defendant dispatched a team to inspect the scene and clean up the debris. A crew dispatched by Engineer Geotechnical Services took photographs of the debris and completed a report of inspection. It identified the accident as occurring at mile post 9.9. Report of Engineer Geotechnical Services (Doc. No. 43-6) at pp. 18-20.

Defendant hired Golder and Associates ("Golder") to conduct an investigation into the rockslide, undertake a site visit and observations, and make recommendations regarding the rockslide. It performed these undertakings on January 15, 2013, and issued a report on January 17, 2013.

In its report, Golder identified the rockslide as occurring at milepost 9.9. It observed and identified the various formations of rock that could be identified visually from track level in the steep slope near the location of the slide. It determined that the slide occurred near the crest of the rock slope, which was "80 to 100 feet vertically above the track grade." Golder Associates Report of January 17, 2013 (Doc. No. 43-6) a p. 2. It opined that "the slide occurred within the middle massive sandstone member (Morgantown) of the Casselman Formation." Id. This sandstone unit is about "20 to 25 [foot] thick in the slope and is underlain by approximately 20 [foot] of thinly-bedded siltstone and shale." Id. Bent trees were observed to the south of the slide indicating "soil/talus creep [was] occurring" and several wet areas also were observed. There was erosion occurring below the lower sandstone unit, indicating a potential for further slides. There was evidence of similar erosion and failure where a prior rockslide occurred "within this same sandstone unit" at mile post 9.8. Id. at p. 3.

Golder identified two factors that likely contributed to the slide: (1) the erosion and undercutting of the underlying weaker, thinly-bedded siltstones and shales; and (2) the freeze and thaw cycles expanding the soil behind the block and reducing cohesion on the joint plain that gave way. Id. The "mechanism" was similar "to the ML 4.9 rockslide mechanism that occurred in November [of] 2012." Id. Similar to the milepost 4.9 rockslide that occurred approximately 10 years earlier, a large rock mass remained near the crest of the slope. Golder

5

opined that "this rock mass will eventually be undermined by the differential weathering and erosion of the siltstone/shale and fall from the slope." Id.

Golder recommended removing the large rock mass at the crest of the slope. It also recommended conducting frequent visual observations of the hillside (such as twice a week) for factors that might indicate hillside instability. It indicated that the slides were more likely to occur with the event of inclement weather, such as heavy rains, sudden temperature changes, and freezing and thawing cycles. Additional visual inspections were recommended following such weather events. Id. at p. 4. If changes to the slopes were detected, Golder recommended that a "slow order" be issued "in this area" to decrease the chance of a train colliding with any slide that occurred. In the alternative, Golder recommended defendant "install a rockfall detection fence at this location tied into the signal system to provide an early warning of a rockfall." Id.

A rockslide also occurred on February 12, 2017, between mile posts 9.9 and 10. Golder was again dispatched to make field observations and recommendations. Crews removed 15 dump truck loads of rock and debris from the tracks.

Golder reported that the 2017 slide was adjacent to the location where the 2013 slide had occurred. At the time of its observations there were two large blocks that remained near the top of the slope but were observed to be moving. They had dropped about 18 feet down the slope, bulldozing a soil pile as they did so and shedding smaller rocks and debris as they moved. In addition, Golder noted the adjacent scarp face of the 2013 rockslide appeared to have minimal stability. Golder cautioned that the large blocks were precariously positioned and the shale that was directly beneath them was mostly gone except for what was directly at their base. It noted that this was the same mechanism that caused the second failure at mile

post 4.5 after the first two blocks there came down, and it opined that the two large blocks that were continuing to move were likely the next rockslide in the making.

Golder recommended that the two main blocks that were still moving be broken up on the slope and scaled down in a controlled manner; the scarp from the 2013 slide be scaled down at that time or within one year; the additional loose rocks on the right be assessed and scaled down if they were minimally stable; and the center nose of the rock beneath the two sliding blocks be assessed and scaled down if necessary; all with care to avoid over-scaling and destabilization. Golder and Associates Report of February 21, 2017 (Doc. No. 43-8) at pp. 2-4.

In March of 2019, defendant solicited proposals for the creation of an artificial intelligence system designed to detect rockslide activity that threatened track integrity. Communications Concepts Integration ("CCI") presented a number of different options to review the types of systems available and select an option that would minimize false positives. In July through September of 2019, defendant installed a support cantilever and camera system near milepost 9.25 as part of a test program. The purpose of the system was proactively to detect and provide early notice of rockslides and/or potential rockslide activity.

The system encompassed thermal cameras, a laser measuring system and artificial intelligence technology to monitor the tracks, the cut rock and the adjacent sections of the steep incline abutting the tracks. It was intended to provide a better system than the previously employed measures for monitoring rockslides and changes in the area that indicated a potential for rockslide activity. In order to work properly, the system had to be "taught" how to distinguish between acceptable ground and other movements and unacceptable rockslides. CCI had recommended that defendant set up slide fences while the system made its own decisions during that learning process.

Challenges arose during the efforts to get the system operational. The laser measuring system and the accompanying artificial intelligence proved to be unsuccessful for the location. During the fall of 2020, the system continued to malfunction and present unanticipated challenges. For example, the system failed to alert to the events that it should have and presented challenges as to its reliability regarding varying weather conditions. Changes were made to the components of the system, including installing a new camera with infrared illuminators. When this failed, it was proposed that the system be set up with LIDAR, which is a form of penetrating radar. The system never became fully functional and was non-operational on the day plaintiffs encountered the rockslide underlying this lawsuit.

Each party retained an expert in preparation for trial. Plaintiff retained George A. Gavalla, a consultant and expert in railroad industry safety standards and practices, to offer opinions as to the safety issues relating to the underlying train derailment and the plaintiffs' resulting injuries. Gavalla authored an expert report about the relation of standard safety practices to the incident. He is prepared to opine that defendant knew or should have known about the history of rockslides in the area and should have taken additional steps to ensure plaintiffs' safety, such as installing a slide fence connected to its signal system or utilizing flagmen. Report of George A. Gavalla (Doc. No. 43-5) at pp. 20-21.

Defendant retained Engineering Systems, Inc. ("ESI"), a geotechnic and engineering firm, to review the defendant's maintenance and inspection practices regarding the rockslide activity at milepost 9.3 on December 12, 2021. The authors of the report are prepared to offer opinions about the differences between the causes for that rockslide and the others that occurred in the vicinity of milepost 9.9 as well as the safety practices defendant utilized in those respective areas. They also are prepared to opine that the rockslides were at distinct

locations that are unrelated from a geotechnical standpoint.  In addition, the 9.3 location was inactive prior to the 2021 incident, it did not pose any more risk than numerous other rock slopes in Western Pennsylvania, and defendant followed accepted as well as proactive safety precautions at that location.  Report of Nathaniel Landsperger, P.E., and Dustin Bell (Doc. No. 43-4) at p. 22.

Plaintiffs contend that the dangerous condition caused by the presence of the rockslide/boulders on the tracks was attributable to the negligence of defendant.  Complaint ¶ 19.  They identify several means by which defendant's actions fell short of the standard of care, including failing to conduct proper inspections, issue effective safety orders, provide effective warnings and utilize appropriate safety equipment.  Id. at ¶¶ 24 (a)-(j).

More specifically, plaintiffs posit that the negligence of the defendant consisted of shortcomings in defendant's system of inspecting for rockslides and potential rockslide activity, including the failure to inspect the hillsides, cut rock and/or the tracks at or near the site of the accident.  This should have been done either pursuant to a routine inspection or as part of a weather-related inspection following the heavy rain and winds that occurred on December 11, 2021.  Further, defendants failed to follow a recommendation by CCI to utilize a slide fence while the artificial intelligence system was transitioned to full operational capacity.  Plaintiffs' Brief in Opposition (Doc. No. 45) at pp. 7-9.

Defendant moves for summary judgment for three basic reasons.  First, it asserts it met its duty to inspect and maintain the tracks at milepost 9.3 under the existing circumstances and its efforts even exceeded the requirements of the Federal Railroad Administration ("FRA").  Defendant's Brief in Support of Motion for Summary Judgement (Doc. No. 42) at p. 7.

Second, plaintiff's expert misinterpreted the underlying facts by resting his conclusions on the proposition that there were prior rockslides at milepost 9.3 when all documentation save one set of "incorrectly completed" forms indicates that the other slides occurred at or near milepost 9.9. Doing so supposedly renders his opinions inadmissible because they are bereft of actual factual support and reflect a gross misinterpretation of the record. And without such factual support, plaintiffs cannot show defendant was aware of a risk of rockslides at the accident site as it relates to satisfying the foreseeability requirement of their negligence claim.

Third, plaintiffs' expert lacks the qualifications to testify as to the foreseeability of rockslides at milepost 9.3. Gavalla admittedly is not a geologist or a geotechnical expert. Nor is he a civil engineer. And he purportedly lacks the background to render a geotechnical analysis. So from defendant's perspective, he does not have the scientific, technical or other specialized knowledge required to provide a conclusion about the probability of rockslides occurring near milepost 9.3.

Pursuant to these three grounds, defendant maintains that plaintiffs lack sufficient evidence to establish a material issue of fact as to the foreseeability of a rockslide at milepost 9.3 on December 12, 2021, and/or that defendant committed any negligence that contributed to plaintiffs' injuries.

Plaintiffs maintain that there is more than sufficient evidence to show defendant was on notice of the potential for rockslides in the area and its own actions and records demonstrate as much. Further, the caselaw is clear that such matters are reserved for the jury to resolve. And the jury may well conclude that defendant was negligent by failing to install a slide fence at the location in question and/or inspect the area after the severe weather on December 11, 2021. And plaintiffs' expert has sufficient experience to opine about these matters. See Plaintiffs'

Counterstatement of Material Facts (Doc. No. 46) at ¶¶ 66-84 (which plaintiffs incorporate into their brief in opposition).

Defendant's contention that Gavalla lacks the requisite expertise to offer opinions about defendant's undertakings and practices as they relate to the safety conditions of the track at milepost 9.3 on December 12, 2023, is unavailing. The issue of whether Gavalla will be permitted to testify generally is governed by a Daubert Inquiry. The record as currently developed supports the admissibility of his proposed testimony.

Under Federal Rule of Evidence 702, trial courts must act as "gatekeeper" and exercise discretion to preclude expert testimony that is unreliable, irrelevant, or unhelpful to the jury. Daubert, 509 U.S. at 597. In the Third Circuit, district courts must focus on the "trilogy of restrictions on expert testimony: qualification, reliability and fit." Calhoun v. Yamaha Motor Corp., U.S.A., 350 F.3d 316 (3d Cir. 2003). Thus, district courts should permit expert testimony so long as: (1) the expert has the necessary qualifications, (2) the testimony is based on reliable methods, and (3) the testimony would assist the trier of fact in understanding the evidence or in resolving factual issues. See In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 741–43 (3d Cir. 1994) ("Paoli II").[1]

Defendant claims that Gavalla does not have the necessary qualifications to testify as an expert on the incident at issue, namely because he is not a geologist, geotechnical expert or a civil engineer. But this position misapprehends the nature of Gavalla's proposed testimony

---

[1] This opinion applies the current version of Rule 702, which was most recently amended on December 1, 2023. "The amendment does not substantively alter Rule 702, but rather 'clarifies that the preponderance standard applies to the three reliability-based requirements added in 2000—requirements that many courts have incorrectly determined to be governed by the more permissive Rule 104(b) standard.'" S.Y. v. Roman Cath. Diocese of Paterson, No. 20CV2605 (EP) (CLW), 2024 WL 1231333, at *2 (D.N.J. Mar. 21, 2024) (quoting Fed. R. Evid. 702 advisory committee's note to 2023 amendments).

and the factual foundations in the record that support it.  Gavalla's testimony is focused on the safety measures defendant did and did not undertake in the area in and around CP Beck where the derailment occurred, what defendant knew or should have known from the plethora of information available to it, what defendant's actions reveal about its knowledge and understandings as they relate to safe rail passage in that corridor and whether defendant's actions and inactions breached the standard of care.  And as to these matters, Gavalla's proposed testimony and opinions meet the foundational requirements for admission under Rule 702.

Gavalla possesses the requisite qualifications to provide testimony as an expert in railroad safety.  To qualify as an expert, the witness must possess specialized expertise, gained from "practical experience as well as academic training and credentials" in the relevant area. Jones v. Swepi L.P., 643 F. Supp. 3d 547, 561 (W.D. Pa. 2022) (quoting Waldorf v. Shuta, 142 F.3d 601, 625 (3d Cir. 1998)).

Gavalla has 47 years of experience in the railroad industry.  ECF Doc. No. 43-5 at p. 27.  Gavalla attended Georgetown University, earning a degree in history, graduated from a senior executive service program at the Federal Executive Institute and completed an executive training course at Harvard University.  From 1976 to 1984, he worked as a communications and signal maintainer for Consolidated Rail Corporation.  He inspected, tested, repaired and built railroad communications and signal systems throughout Conrail's territory, which consisted of Washington D.C., Maryland, Virginia, Pennsylvania and Delaware.  Among other things, he was responsible for the installation and maintenance of rockslide detection systems, including slide fences, throughout this territory.  Id. at 2.  Plaintiffs are prepared to elicit further testimony about Gavalla's experience in these matters.

After working for seven years as an assistant general chairman and four years as the director of research for the Brotherhood of Railroad Signalmen, in 1995 Gavalla joined the FRA as a safety project coordinator on the Amtrak, Long Island Railroad and the Union Pacific Railroad. ECF Doc. No. 43-5 at pp. 3, 29. There he conducted large scale assessments of passenger rail operations and safety. In this role he had to become familiar with all regulations and railroad rules, policies, and safety management practices. Id. at p. 3. Plaintiffs are prepared to elicit testimony from Gavalla to the effect that as part of his duties he researched rockslides and fault planes and the propensity of adjacent rock formations to collapse once there had been a prior rockslide. It is apparent that Gavalla will be able to provide this background information.

In October of 1997, Gavalla became the Associate Administrator for Safety with the FRA, wherein he was the senior manager of the FRA's Office of Safety. He served in that capacity until early 2004. Id. at 29. As the senior official in the Office of Safety, he had to oversee the safety of our nation's railroads and the managing of FRA's safety programs, including promulgating new and revised federal railroad safety regulations, overseeing the enforcement those regulations and conducting railroad accident investigations. Id. at 3.

Since 2011, Gavalla has run his own railroad safety consulting company, which utilizes a network of railroad safety and operations experts. Id. His projects have included performing safety assessments of rail operations, conducting safety training, developing rules and procedures regarding train operations, conducting track inspections and risk assessments, and providing hazard analyses of highway-rail grade crossing systems. Id.

It is undisputed that the use of slide fences in areas prone to rockslides have been very common for many decades and provide a widely accepted standard of care on all major

railroads.  Id. at 9-10.  Indeed, defendant employed these fences at hundreds of locations throughout its territory.  Spadone Deposition (Doc. No. 46-3) at p. 7.  Gavalla is not a geotechnical engineer.  Nevertheless, he does have a developed understanding of railroad industry policies and procedures for managing and mitigating the risks of rockslides, falling rocks and landslides.  Gavalla Report (Doc. 45-3) at p. 15.

It is clear that Gavalla has gained specialized expertise in railroad safety from his education and extensive years of experience working in, with and overseeing safety regulations involving railroads.  His exposure to, experience with and safety evaluation of the common components of railroad safety practices and procedures is readily apparent.  Gavalla has extensive experience in working with, reviewing and analyzing railroad safety practices, which necessarily includes the common use of slide fences.  Thus, there appears to be little doubt that Gavalla has the requisite experience to testify about the common uses of slide fences and the safety regulations and circumstances surrounding their use.

It likewise follows that Gavalla has the requisite experience to testify about the general and/or specific circumstances surrounding the use of slide fences as they relate to maintaining safe practices on the railroad.  As Spadone confirmed, the use of slide fences is a common safety measure employed by railroads and defendant utilizes them at hundreds of locations on its tracks.  And defendant has to monitor and make decisions about the need for utilizing these and other measures to combat the threat of rockslides at these various locations with its ordinary workforce, which does not include geological, geotechnical or civil engineering experts.  It follows that Gavalla's familiarity with the circumstances connected to the use of such a common component of safety on the railroad can readily be assumed.

For the same reasons, Gavalla has the experience to offer testimony and conclusions about defendant's use of the prototype artificial intelligence system employed by defendant at CP Beck as well as the safety regulations and concerns surrounding that undertaking. His experience provides a sufficient basis to assess the safety regulations and accepted safety practices implicated by that undertaking, and whether defendant satisfied the applicable standards of care while attempting to get that system to full functionality.

In short, Gavalla is qualified under Rule 702 to render opinions on the adequacy of safety measures put in place and/or omitted by defendant in conjunction with the general area and/or the specific location where the underlying derailment occurred.

Next, Gavalla's testimony is reliable. The reliability inquiry is a flexible one wherein the court must focus solely on the expert's chosen principles and methodology rather than the conclusions drawn therefrom. Daubert, 509 U.S. at 594–95. "To be reliable, the expert's opinion must be premised on more than mere subjective belief or unsupported speculation; the expert must have good grounds for his or her belief." Marcum v. Columbia Gas Transmission, LLC, 549 F. Supp. 3d 408, 416 (E.D. Pa. 2021) (quoting Paoli II, 35 F.3d at 742) (internal quotation marks omitted).

Whether "good grounds" support an expert's potential testimony depends on various factors, including: "(1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put." Jones, 643 F.

Supp. 3d at 562 (quoting <u>Pineda v. Ford Motor Co.</u>, 520 F.3d 237, 247–48 (3d Cir. 2008)). But these factors are not exhaustive and some may be more or less applicable depending on the case.  <u>See</u> <u>Pineda</u>, 520 F.3d at 248.  Trial courts have broad latitude in determining whether these specific factors are "reasonable measures of reliability in a particular case."  <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 153, 119 S. Ct. 1167, 1176, 143 L. Ed. 2d 238 (1999).

Gavalla's opinions and testimony are based on his years of experience working with, overseeing and evaluating railroad safety measures in a variety of settings.  He also "review[ed] relevant materials; review[ed] safety rules, procedures and standards; examine[ed] relevant documents, [and] review[ed] testimony and evidence obtained through discovery relative to th[is] case."  ECF Doc. No. 43-5 at p. 2.  Thus, he used his practical experience to assess the safety standards that were employed or not employed by defendant.  And he drew on accepted industry standards in formulating his opinion.  Accordingly, Gavalla's proposed testimony and opinions sufficiently are premised on his knowledge, experience, and facts in the record to satisfy the reliability prong.

Finally, Gavalla's testimony "fits" because there are good grounds to believe it would help a jury decide a factual dispute.  To determine whether an expert's testimony "fits" the proceedings, the trial court asks "whether [the] expert testimony proffered . . . is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."  <u>United States v. Schiff</u>, 602 F.3d 152, 173 (3d Cir. 2010) (quoting <u>Daubert</u>, 509 U.S. at 591). This requirement goes primarily to relevance.  <u>See</u> <u>Daubert</u>, 509 U.S. at 591.  Even if an expert's testimony is based on their specialized knowledge, "the testimony will be excluded if it is not knowledge related to the purposes of, or pertinent inquiry to, the case."  <u>Jones</u>, 643 F. Supp. 3d at 563.  Gavalla's testimony meets this requirement: it directly addresses a number of the

fundamental factual disputes in this litigation, including whether defendant met its duty of care with regard to the safety protocols that were utilized or omitted.

Having established that Gavalla is a qualified expert, his opinions are sufficiently reliable, and there are good grounds to believe that the testimony will be helpful to the jury, plaintiffs have met the foundational requirements for admission under Rule 702.  Therefore, the court will assume for the purposes of resolving defendant's summary judgment that the expert testimony proffered by plaintiff relating to the applicable standards of care and whether defendant breached those standards is admissible.[2]

Defendant's contention that plaintiffs' ability to prove the potential of a rockslide at CP Beck was foreseeable to defendant requires the testimony of a geologist, geotechnical expert or a civil engineer is misplaced.  Even assuming for the sake of argument that Gavalla relied on an assumption of fact that the major derailments in 2013 and 2017 were at the same location as the underlying derailment and this assumption was erroneous, the record contains more than sufficient evidence from which the finder of fact can determine that the potential for rockslides in the vicinity of milepost 9.3 was foreseeable to defendant prior to the December 12, 2021, incident.

Under the FELA "[e]very common carrier by railroad ... shall be liable in damages to any person suffering injury while he is employed by such carrier ... for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier...." 45 U.S.C. § 51.  The FELA is a negligence statute with a relaxed standard of causation.  Consolidated Rail Corp. v. Gottshall, 512 U.S. 532, 542–543 (1994).

---

[2] This ruling will be without prejudice to either party filing additional motions *in limine*, including a Daubert motion provided there are reasonable grounds for doing so.

In order to present a *prima facie* case under the FELA, an employee must establish that: (1) he was injured within the scope of his employment; (2) his employment was in furtherance of the railroad's interstate transportation business; (3) the railroad was negligent; and (4) that negligence played some part in causing the injury for which he seeks compensation.  See Monheim v. Union R. Co., 996 F. Supp. 2d 354, 361 (W.D. Pa. 2014) (citing Van Gorder v. Grand Trunk W.R.R., 509 F.3d 265, 269 (6th Cir.2007)).  "Although the standard for causation is lessened under the FELA, a plaintiff must nevertheless demonstrate the common law elements of negligence: i.e., duty, breach, foreseeability, and causation."  Monheim, 996 F. Supp. 2d at 361; see also Illinois Cent. R.R. Co. v. Skaggs, 240 U.S. 66 (1916); Gottshall v. Consol. Rail Corp., 988 F.2d 355, 374 (3d Cir. 1993), rev'd on other grounds, 512 U.S. 532 (1994).

At the summary judgment stage, "the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought."  Hines v. Consol. Rail Corp., 926 F.2d 262, 267 (3d Cir. 1991) (quoting Rogers v. Missouri Pac. R. Co., 352 U.S. 500, 506 (1957)).  Thus "a FELA plaintiff need only present a minimum amount of evidence in order to defeat a summary judgment motion."  Hines, 926 F.2d at 268 (citing Pehowic v. Erie Lackawanna R.R., 430 F.2d 697 (3d Cir.1970)).

The duty of care under the FELA is for an employer to provide its employees with a reasonably safe work environment under the circumstances.  Monheim, 996 F. Supp. 2d at 361. See Atchison Ry. Co. v. Buell, 480 U.S. 557, 558 (1987); Bailey v. Cent. Vermont Ry., 319 U.S. 350, 352 (1943); Tiller v. Atlantic C.L.R. Co., 318 U.S. 54, 67 (1943).  "The employer's liability is to be determined under the general rule which defines negligence as the lack of due

care under the circumstances; or the failure to do what a reasonable and prudent man would ordinarily have done under the circumstances of the situation; or doing what such a person under the existing circumstances would not have done." Tiller v. Atl. Coast Line R. Co., 318 U.S. 54, 67 (1943).  In other words, a railroad breaches its duty when it knew, or by the exercise of due care should have known, that its operations were inadequate to protect its employees.  Urie v. Thompson, 337 U.S. 163, 182 (1949).

So, the ultimate question is whether a reasonable jury could reach the conclusion that the employer was negligent in whole or in part and whether any such negligence was a cause in bringing about the plaintiff's injuries.  In this regard, an FELA plaintiff must present probative facts from which the negligence and causal relationship can reasonably be inferred in order to survive summary judgment.  Monheim, 996 F. Supp. 2d at 362 (citations omitted).  Even though the standards of proof and causation are lessened under the FELA, a plaintiff cannot survive summary judgment based on pure speculation or a record completely devoid of probative facts.  Monheim, 996 F. Supp. 2d at 361-62 (citations omitted).

With regard to foreseeability, a FELA plaintiff "must show that the employer, with the exercise of due care, 'could have reasonably foreseen that a particular condition could cause injury' and had, or should have had, some knowledge of the unsafe condition." Manson v. Southeastern Pennsylvania Transp. Auth., 767 A.2d 1, 4 (Pa. Commw. Ct. 2001) (quoting Porreca v. Nat'l R.R. Passenger Corp., No. 98-4137, 1999 WL 199806, at *1 (E.D. Pa. Apr. 7, 1999)); Bruce v. Norfolk Southern Railway Co., 2022 WL 510552 (W.D. Pa. Jan. 3, 2022) (same).  In other words, "[it] must be shown that the employer, with the exercise of due care, could have reasonably foreseen that a particular condition could cause injury." Emig v. Erie Lackawanna Ry. Co., 350 F. Supp. 986, 988 (W.D. Pa. 1972).  And the plaintiff must present

sufficient evidence to justify submitting the issue of the defendant's knowledge or failure to discover an unsafe condition to the jury.  Manson, 767 A.2d at 4.

Defendant's contention that it met and even exceeded the applicable safety regulations as they relate to the conditions existing at CP Beck at the time of the accident, even if true, does not exempt it from plaintiffs' claims.  Such a showing "is not determinative with respect to whether a work environment is reasonably safe under the FELA."  Monheim, 996 F. Supp. 2d at 363 (citing Allenbaugh v. BNSF Ry. Co., 832 F.Supp.2d 1260, 1265 (E.D. Wash. 2011)). In other words, "just because [a] [r]ailroad was essentially doing what every other railroad was doing does not mean that the [r]ailroad was providing a reasonably safe workplace."  Id.

Here, defendant contends it not only met safety regulations but exceeded them. Defendant's Brief in Support of Motion for Summary Judgement at p. 2.  While defendant may seek to convince the jury that its actions did not fall below the accepted standards based on the information known or that it should have known under the existing circumstances, a showing of compliance with all applicable FRA regulations does not preclude plaintiffs from showing that defendant failed to provide a reasonably safe workplace.

Similarly, defendant's attempt to limit the issue of foreseeability to a geological, geotechnical or civil engineering assessment inappropriately discounts the body of direct and circumstantial evidence from which plaintiffs may establish that the potential for rockslides in the area in general, and at milepost 9.3 in particular, was foreseeable to defendant.  With regard to establishing foreseeability, a FELA plaintiff need only present a minimum amount of evidence to defeat a summary judgment motion.  Hines, 926 F.2d at 268 (citing Pehowic, 430 F.2d at 699-700); Monheim, 996 F. Supp.2d at 362.  In this regard, the Supreme Court has "adopted a broad interpretation" of the element and the types of circumstantial evidence that

can be used to satisfy it. <u>Hines</u>, 926 F.2d at 268 (citing <u>Gallick</u>, 372 U.S. at 117 and collecting cases). And in this jurisdiction, "[a] trial court is justified in withdrawing . . . issue[s] from the jury's consideration only in those extremely rare instances where there is a zero probability either of employer negligence or that any such negligence contributed to the injury of an employee." <u>Pehowic</u>, 430 F.2d at 699–700; <u>Monheim</u>, 996 F. Supp.2d at 362 (citing <u>Eckert v. Aliquippa & S. R.R.</u>, 828 F.2d 183, 187 (3d Cir. 1987) (applying <u>Pehowic</u>'s zero probability test) and <u>Masters v. Norfolk S. Ry. Co., Inc.</u>, No. 08–1872, 2010 WL 4973315, at *8 (Oct. 6, 2010) (same)).

"The ultimate question is whether a reasonable jury could reach the conclusion that the employer was negligent in whole or in part" and an "FELA plaintiff must present probative facts from which the negligence and causal relationship can reasonably be inferred in order to survive summary judgment." <u>Monheim</u>, 996 F. Supp.2d at 362 (citing Rogers, 352 U.S. at 508 and <u>Dessi v. Pa. R.R. Co.</u>, 251 F.2d 149, 151 (3d Cir. 1958)). However, even with these lesser standards of proof for negligence and causation, a plaintiff cannot survive summary judgment based on pure speculation or a record completely devoid of probative facts. <u>Id.</u> (citing <u>Newton v. Norfolk S. Corp.</u>, No. 05–1465, 2008 WL 55997, *8 (W.D. Pa. Jan. 3, 2008)).

Here, several aspects of the record can be used to satisfy the foreseeability requirement. First, Mansfield is prepared to recount a long history of rockslides in the vicinity of CP Beck, which was well-known to those who regularly worked in the area. Mansfield indicated the area had been prone to slides since the time he began working for defendant (which was over a decade) and there had been multiple slides on just about the whole Mon Line. One involved Teddy Karas at about the same location. Marchionda testified that this one occurred around

the time he was hired.  The 2013 slide with Cathy Leis was reported by her and her supervisor as occurring near the location in question and even assuming it occurred close to or near milepost 9.9, it did occur on Mon Line within a half a mile from the location in question.  The 2017 slide was adjacent to the site of the 2013 slide.  Mansfield recalled another slide involving Sam Wagner occurring near milepost 9 in 2018.  And Marchionda recounted another slide on the Mon Line near Mt. Washington after the one involving Wagner.  While defendant may choose to defend on the ground that each of these incidents involved locations that where distinct from a geotechnical perspective, it appears that the testimony at trial will support an inference that the Mon Line in general and the area known as CP Beck in particular was a hotbed for slide activity.

Second, the jury may make a comparison between the face of the sheared rock formation and ascending incline abutting the tracks at milepost 9.3 and those same characteristics at milepost 9.9.  In doing so, they may draw on any understandings that should have been known by defendant's workforce and observation crews in assessing the similarities and differences in the safety risk that these two locations presented.  Defendant had to use its regular work force to monitor slide prone areas and to make decisions about the risks they presented on a day-to-day basis.  Although defendant had outside geotechnical experts available for consultation, its workforce and observation crews were not geotechnical experts. They were, however, trained on a general level to look for geometric or FRA defects and were directed to inspect visually the slopes, cut sections and rock faces abutting the tracks as part of their required inspections.  So, there were ongoing efforts and decisions made by defendant's workforce about these aspects of the terrain and the weather conditions that presented at any

given time.  And safety decisions were regularly made based in part on what was observed about the conditions of the tracks and the inclines and hillsides that abut them.

Against this backdrop, the pictures of 1) the derailment, 2) the Prototype AI Camera Slide Detector and 3) the comparisons of the cut rock walls at mileposts 9.2 and 9.9 provide insight into what defendant's inspection crews and management personnel would have seen and understood in fulfilling defendant's duties to provide a safe workplace at each of those locations.  In this regard, defendant's photographs depicting the cut rock and steep inclines existing where the derailment in question occurred and at milepost 9.9 bear substantial similarities.  While being presented as photographs of different locations, the size and vertical ascent of the cut rock formations abutting the tracks share many of the same characteristics.  Thus, while defendant is free to argue that the two locations presented very different risks for rockslide activity from a geological and geotechnical point of view, the very nature of the inclines, the cut rock protruding from the face of the vertical inclines, the distinct formation of the layers of stone, debris at the base of the incline abutting the tracks near milepost 9.3 and the catch basin at that location provide some evidence from which the finder of fact may inform its assessment of whether defendant was on notice of a potential for rockslides at the CP Beck derailment site.

Third, and tellingly, defendant chose to locate the Prototype AI Camera Slide Detector in close proximity to where the derailment occurred.  Defendant installed this system as a proactive measure to provide early detection of potential rockslides.  The system was installed within 600 feet of where the derailment occurred.  Again, assuming there had not been any significant slides at that precise location at the time of installation, there had been a number of other slides near that location and significant slides within a half mile of it as noted above.  The

plan was to prevent future rockslides and the idea was for the camera system to capture a potential rockslide in real time while identifying other obstructions that would not pose the safety risks of a rockslide and then distinguish between the two.  It was planned that the system would be integrated so that train crews would receive notice of a potential obstruction through either radio dispatch or a stop signal within the existing signal system.

To gain functionality, the AI system had to be taught to differentiate between the events in the environment around it that were acceptable and those that were not.  In other words, defendant had to select a location that had the potential to expose the system to rockslides that had the potential to present a danger to safe rail passage and those that were minor and did not pose such a safety risk.  Defendant chose a location close to CP Beck as being capable of providing a terrain that presented the potential for these differing events in real time.  And the jury may consider the siting of system near the derailment site as some evidence about whether defendant knew or had reason to know that the near vertical incline abutting the tracks and face of the cut rock at the derailment site presented a foreseeable risk of rockslides that threatened the safety of train operations and railroad crews.  And they can consider the degree to which CCI's recommendation that a slide fence be used while the system was brought up to full functional capacity has a bearing on whether a foreseeable risk of rockslides existed at or near CP Beck prior to the derailment as well as whether defendant breached a duty by failing to use an alternative measure to provide a safe workplace at that location.

It follows that these aspects of record provide sufficient direct and circumstantial evidence from which the jury can find that prior to the derailment defendant could foresee a risk of harm to crew members at or near that site.  In other words, there is not zero probability of defendant being found to have been negligent and the issue of foreseeability is an issue of

fact for the jury to decide notwithstanding the fact that plaintiffs do not intend to introduce their own geotechnical or civil engineering expert.  Consequently, this component of defendant's motion for summary judgment cannot bear the weight defendant assigns to it.

In short, there are numerous issues of material fact for the jury to decide.  Among them are whether defendant knew or should have known that rockslides were likely to occur in the area and whether a rockslide that would present a risk to crew safety at or near CP Beck was foreseeable to defendant prior to the derailment, whether the weather conditions were severe enough to cause the need for additional inspection, whether defendant's actions or inactions at that location were consistent with its duties to provide a reasonably safe workplace, and so forth.  These are all issues which the jury must determine.  And plaintiff's safety expert and the record as developed supply sufficient evidence from which the elements of plaintiffs' claims can be satisfied.

For the reasons set forth above, defendant's motion for summary judgement will be denied.  An appropriate order will follow.

Date: September 25, 2025

s/David Stewart Cercone
David Stewart Cercone
Senior United States District Judge

cc:    Lawrence A. Katz, Esquire
       Michael J. Olley, Esquire
       T. H. Lyda, Esquire
       Edwin B. Palmer, Esquire

       (Via CM/ECF Electronic Mail)